Karen LeCraft Henderson, Circuit Judge:
The Mine Safety and Health Administration (MSHA), housed in the United States Department of Labor (Labor), sets health and safety standards for mine operations. Its regulatory authority is subject to a unique limitation: "[n]o mandatory health or safety standard ... shall reduce the protection afforded miners by an existing mandatory health or safety standard." 30 U.S.C. § 811(a)(9). The no-less-protection standard occupies center stage in the case before us. In 2017, MSHA promulgated a safety standard that requires mine operators to examine all areas before miners begin work and to record all "conditions that may adversely affect safety or health" discovered during the examination. Examinations of Working Places in Metal and Nonmetal Mines , 82 Fed. Reg. 7680, 7682 (Jan. 23, 2017) (2017 Standard). Fourteen months later, however, MSHA amended the requirements, allowing examinations to occur before or as miners begin work and allowing mine operators to exclude from their records adverse conditions that are promptly corrected. Examinations of Working Places in Metal and Nonmetal Mines , 83 Fed. Reg. 15,055 (Apr. 9, 2018) (codified at 30 C.F.R. §§ 56.18002(a) - (c), 57.18002(a) - (c) ) (2018 Amendment). We are called upon to decide whether MSHA explained adequately how the amendments to the 2017 Standard comply with the no-less-protection standard.
I. BACKGROUND
The Federal Mine Safety and Health Act of 1977, Pub. L. No. 91-173, 83 Stat. 742 (codified as amended at 30 U.S.C. §§ 801 et seq. ) (Mine Act), directs the Labor Secretary to "develop, promulgate, and revise as may be appropriate, improved mandatory health or safety standards for the protection of life and prevention of injuries in coal or other mines." 30 U.S.C. § 811(a). The Secretary discharges his Mine Act responsibilities through MSHA. The Mine Act includes a no-less-protection standard, which provides that "[n]o mandatory health or safety standard ... shall reduce the protection afforded miners by an existing mandatory health or safety standard." Id. § 811(a)(9). This unusual limitation "expressly mandates that no reductions in the level of safety below existing levels be permitted, regardless of the benefits accruing to improved efficiency." United Mine Workers of Am., Int'l Union v. Dole , 870 F.2d 662, 666 (D.C. Cir. 1989).
MSHA has for decades required examinations of mine workplaces and imposed recordkeeping requirements on mine operators. From 1979 to 2017, MSHA required "[a] competent person designated by the *1282 operator" to "examine each working place at least once each shift for conditions which may adversely affect safety or health." 30 C.F.R. § 56.18-2(a) (1980); see also id. § 57.18-2(a) (same requirements for underground mines). The examination could occur anytime during the shift. Id. The standard also mandated that operators keep "[a] record that [ ] examinations were conducted."Id. § 56.18-2(b); see also id. § 57.18-2(b) (underground mines).
In 2017, MSHA decided to impose more stringent requirements. Examinations of Working Places in Metal and Nonmetal Mines , 82 Fed. Reg. at 7680-81. It adopted a new standard for workplace examinations: "[a] competent person designated by the operator shall examine each working place at least once each shift before miners begin work in that place, for conditions that may adversely affect safety or health." 30 C.F.R. § 56.18002(a) (2017) (emphasis added) (2017 Standard); see also id. § 57.18002(a) (underground mines). It also added more detailed recordkeeping requirements, demanding for the first time that a record of an examination include (as relevant here): a "description of each condition found that may adversely affect the safety or health of miners." Id. § 56.18002(b) ; see also id. § 57.18002(b) (underground mines). The 2017 Standard was originally slated to take effect on May 23, 2017. MSHA twice delayed the effective date. See Examinations of Working Places in Metal and Nonmetal Mines , 82 Fed. Reg. 15,173 (March 27, 2017) ; Examinations of Working Places in Metal and Nonmetal Mines , 82 Fed. Reg. 23,139 (May 22, 2017). After a three-day period of effectiveness in October 2017, MSHA temporarily withdrew the 2017 Standard and delayed its effective date for a third time. See Examinations of Working Places in Metal and Nonmetal Mines , 82 Fed. Reg. 46,411 (Oct. 5, 2017).
In April 2018, MSHA promulgated a final rule amending the requirements of the 2017 Standard. Examinations of Working Places in Metal and Nonmetal Mines , 83 Fed. Reg. at 15,055 (2018 Amendment). Under the 2018 Amendment, a competent person must "examine each working place at least once each shift before work begins or as miners begin work in that place [ ] for conditions that may adversely affect safety or health." 30 C.F.R. § 56.18002(a) (emphasis added); see also id. § 57.18002(a) (underground mines). Unlike the 2017 Standard, then, the 2018 Amendment gives mine operators the option to conduct examinations as miners begin work in an area. Id. The 2018 Amendment also modifies the recordkeeping requirement to mandate that a "record shall contain the ... description of each condition found that may adversely affect the safety or health of miners and is not corrected promptly ." Id. § 56.18002(b) (emphasis added); see also id. § 57.18002(b) (underground mines). The new language allows a mine operator to omit from its records promptly corrected adverse conditions. Id. The 2018 Amendment went into effect on June 2, 2018.
Petitioners the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO/CLC, and the United Mine Workers of America International Union filed a timely petition for review of the 2018 Amendment. They claim that the 2018 Amendment violates both the Mine Act's no-less-protection standard, 30 U.S.C. § 811(a)(9), and the Administrative Procedure Act, 5 U.S.C. §§ 701 et seq .
II. ANALYSIS
The Mine Act requires MSHA to "state the basis for its conclusion" that a new health or safety standard satisfies the *1283 no-less-protection standard. Nat'l Min. Ass'n v. MSHA , 116 F.3d 520, 536 (D.C. Cir. 1997) (per curiam) (no-less-protection standard "requires the agency to state the basis for its conclusion that the [standard] has been satisfied"). The statement is subject to review under the Administrative Procedure Act and must manifest that MSHA engaged in reasoned decisionmaking. See id. ; see also Rosebud Mining Co. & Parkwood Res., Inc. v. MSHA , 827 F.3d 1090, 1101 (D.C. Cir. 2016) (MSHA action reviewed under Administrative Procedure Act). Our review "is, as always, 'highly deferential and presumes the validity of agency action.' " Nat'l Min. Ass'n , 116 F.3d at 536 (quoting Dole , 870 F.2d at 666 ).
A. EXAMINATION REQUIREMENT
The petitioners first claim that MSHA failed to explain adequately how the 2018 Amendment's examination requirement complies with the no-less-protection standard. As noted, the 2017 Standard required examinations to occur before miners begin work in an area. 30 C.F.R. § 56.18002(a) (2017) ; see also id. § 57.18002(a). By contrast, the 2018 Amendment "allows miners to enter a working place at the same time a competent person examines for adverse conditions." Examinations of Working Places in Metal and Nonmetal Mines , 83 Fed. Reg. at 15,058. On its face, this change appears to increase miners' exposure to health and safety risks. As the Labor Secretary has observed, a careful person does not check the sturdiness of his ladder after climbing half the rungs nor does a careful mine operator check the safety of an area while allowing miners to work there. See Secretary of Labor's Response Brief at 18-19, Nat'l Mining Ass'n et al. v. MSHA , No. 17-11207 (11th Cir. July 19, 2017) (invoking ladder analogy for mine safety argument). Even so, MSHA claims the no-less-protection standard is satisfied because under the 2018 Amendment, as under the 2017 Standard, adverse conditions will be "identified and miner notification provided before miners are potentially exposed to the conditions."[1] Examinations of Working Places in Metal and Nonmetal Mines , 83 Fed. Reg. at 15,058.
The problem with this explanation is that the 2018 Amendment does not allow for notification before exposure. Its notification provisions state: "[t]he operator shall promptly notify miners in any affected areas of any conditions found that may adversely affect safety or health" and "[c]onditions noted by the person conducting the examination that may present an imminent danger shall be brought to the immediate attention of the operator." 30 C.F.R. § 56.18002(a)(1)-(2). These provisions require notification as soon as an adverse condition is discovered. Id. Nowhere do they require notification before miners are exposed . See id . Because the 2018 Amendment allows miners to work in an area before the examination is completed, there is the likelihood that miners may be exposed to an adverse condition before it is discovered. Id. § 56.18002(a) ("A competent person ... shall examine each working place at least once each shift before work begins or as miners begin work in that place."). MSHA's attempt to explain *1284 how the examination requirement complies with the no-less-protection standard relies on a non-existent notification-before-exposure duty and is therefore arbitrary and capricious.[2] Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. StateFarm Mut. Auto. Ins. Co. , 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) (action is arbitrary and capricious "if the agency has ... offered an explanation ... so implausible that it could not be ascribed to a difference in view or the product of agency expertise").
The explanation is arbitrary and capricious for a second reason: it cannot be reconciled with factual findings that MSHA made in support of the 2017 Standard. An agency is generally free to change positions so long as it can "show that there are good reasons for the new policy," not "that the reasons for the new policy are better than the reasons for the old one." FCC v. Fox Television Stations, Inc. , 556 U.S. 502, 515, 129 S.Ct. 1800, 173 L.Ed.2d 738 (2009). This flexibility has limits. If the "new policy rests upon factual findings that contradict those which underlay its prior policy," the agency must offer "a reasoned explanation ... for disregarding facts and circumstances that underlay ... the prior policy." Id. at 515-16, 129 S.Ct. 1800. In promulgating the 2017 Standard, MSHA found that "[i]f the examination is performed after miners begin work, miners may be exposed to conditions that may adversely affect their safety and health." Examinations of Working Places in Metal and Nonmetal Mines , 82 Fed. Reg. at 7689. For that reason, MSHA explained, the 2017 Standard "requires that a competent person conduct an examination before work begins so that conditions that may adversely affect miners' safety and health are identified before they begin work and are potentially exposed ." Id. at 7683 (emphasis added). MSHA took a new contrary-to-fact position in the 2018 Amendment: miners can begin work before the required examination is completed without being exposed to adverse conditions. Examinations of Working Places in Metal and Nonmetal Mines , 83 Fed. Reg. at 15,058. It gave no explanation for the change.
There is another unexplained departure. From 1979 to 2017, MSHA's safety standard allowed operators to conduct an examination anytime during a shift. See 30 C.F.R. § 56.18-2(a) (1980); see also id. § 57.18-2(a) (underground mines). This flexibility, in MSHA's "experience," created "a significant degree of variability in how safety programs are operationalized." Examinations of Working Places in Metal and Nonmetal Mines , 82 Fed. Reg. at 7689. MSHA introduced the 2017 Standard, in part, to "reduce the variability in how operators conduct examinations of working places and thereby improve miners' safety and health." Id. The 2018 Amendment reintroduced that very same variability by allowing examinations to occur before or while miners begin work. E.g. , 30 C.F.R. § 56.18002(a). Despite citing increased flexibility as a boon for mine operators, MSHA completely ignored its previous finding that increased flexibility (read: variability) does not improve miner *1285 safety. Examinations of Working Places in Metal and Nonmetal Mines , 83 Fed. Reg. at 15,058. For these reasons, we agree with the petitioners that MSHA has failed to explain adequately how the 2018 Amendment's examination requirement complies with the statutory no-less-protection standard.
B. RECORDKEEPING REQUIREMENT
The petitioners next argue that MSHA failed to provide a reasoned explanation why the recordkeeping requirement of the 2018 Amendment satisfies the no-less-protection standard. In the preamble to the 2017 Standard, MSHA determined that "recording all adverse conditions, even those that are corrected immediately , will be useful as a means of identifying trends," which "should help inform mine management regarding areas or subjects that may benefit from increased safety emphasis." See Examinations of Working Places in Metal and Nonmetal Mines , 82 Fed. Reg. at 7686 (emphasis added). MSHA acknowledged this determination in the preamble to the 2018 Amendment. Examinations of Working Places in Metal and Nonmetal Mines , 83 Fed. Reg. at 15,059. It nonetheless concluded that "a recording exception for adverse conditions that are corrected promptly," like the one created by the 2018 Amendment, "will yield as much or more in safety benefits, because it encourages prompt correction of adverse conditions." Id.
MSHA's unsupported explanation does not withstand scrutiny. An agency must "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.' " State Farm Mut. Auto. Ins. Co. , 463 U.S. at 43, 103 S.Ct. 2856 (quoting Burlington Truck Lines v. United States , 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962) ). MSHA recognized that the recordkeeping requirements of both the 2017 Standard and the 2018 Amendment provide safety benefits. Examinations of Working Places in Metal and Nonmetal Mines , 83 Fed. Reg. at 15,059. Under the no-less-protection standard, then, MSHA's burden was to explain why the benefits of the 2018 Amendment equal or exceed those of the 2017 Standard. See 30 U.S.C. § 811(a)(9). MSHA instead declared, without further elaboration, that the 2018 Amendment "will yield as much or more in safety benefits, because it encourages prompt correction of adverse conditions." Examinations of Working Places in Metal and Nonmetal Mines , 83 Fed. Reg. at 15,059. This reasoning-the 2018 Amendment will yield better safety protection by incentivizing mine operators to promptly correct adverse conditions-is, at best, specious. The 2017 Standard already requires mine operators to "promptly initiate appropriate action to correct [adverse] conditions." 30 C.F.R. §§ 56.18002(a)(1), 57.18002(a)(1). MSHA cannot, without explanation, justify the 2018 Amendment on the basis that it will encourage mine operators to follow safety measures already required by law in the very same regulation. Moreover, MSHA has offered no basis for its conclusion that those supposed benefits will equal or exceed those yielded by the 2017 Standard. Because the record lacks a reasonable justification for the recordkeeping requirement's supposed safety benefits and any comparative analysis whatsoever, MSHA's explanation is arbitrary and capricious. See Amerijet Int'l, Inc. v. Pistole , 753 F.3d 1343, 1350 (D.C. Cir. 2014) ("conclusory statements will not do" under arbitrary and capriciousness standard).[3]
*1286 The dissent would uphold MSHA's conclusory explanation and repeatedly takes us to task for not affording MSHA enough deference. Dissent at 1288-91. The dissent locates its deference principle in National Mining Association v. MSHA , 116 F.3d 520 (D.C. Cir. 1997) (per curiam), a case in which we rejected no-less-protection standard challenges to an MSHA safety standard, id. at 535-49. Importantly, however, the petitioners there challenged MSHA's factual determinations that the new standard provided miners with as much protection as the old standard. E.g. , id. at 542 ("The Union's remaining challenges under the no-less protection rule require only brief comment because they too involve challenges to the Secretary' net effects determinations that the new regulation will not diminish the level of safety for miners that existed under the prior regulations." (emphases added)). Applying "well-established principles of deference to agency action," id. at 536, we rejected the challenges because "we are required to defer to the agency on factual determinations underlying its decision," including a net safety effects determination, id. at 537. A deference standard for "factual determinations" has little to do with the arbitrary and capriciousness challenge before us.
In addition, the dissent claims that, because MSHA's thin explanation for its compliance with the no-less-protection standard in National Mining Association survived judicial review, MSHA's even thinner explanation here must do so as well. Dissent at 1289-90. Our colleague overlooks two crucial points. First , the National Mining Association petitioners did not challenge the adequacy of MSHA's explanation for its compliance with the no-less-protection standard and therefore we did not decide whether that explanation would survive arbitrary and capriciousness review. See Nat'l Mining Ass'n , 116 F.3d at 535-49. Any inferences the dissent divines from National Mining Association regarding this issue are therefore dicta. Second , National Mining Association upheld many aspects of the challenged regulation, including those recited by the dissent, see Dissent at 1289-90, based on the petitioners' failure to provide evidence contradicting MSHA's findings or persuasive reasons for doubting its determinations. See, e.g. , Nat'l Mining Ass'n , 116 F.3d at 539 ("The Union does not offer any evidence to dispute the Secretary's position."); id. at 542 ("The Union has pointed to no reason to conclude that the Secretary's determination ... is outweighed ...."); id. at 543 (finding "unpersuasive *1287 the Union's contention that the new regulation removes [ ] incentive[s] ...."). Here, by contrast, MSHA had to contend with its own previous findings in promulgating the 2017 Standard that requiring mine operators to record all adverse conditions, including those that are immediately corrected, helps "expedite[ ] the correction of these conditions" and "identify[ ] trends" and "areas or subjects that may benefit from increased safety emphasis." Examinations of Working Places in Metal and Nonmetal Mines , 82 Fed. Reg. at 7686. Thus, an explanation that might have sufficed in National Mining Association with MSHA writing on a blank slate is inapplicable here with MSHA's 2017 findings already on the books.
In sum, MSHA failed to offer a reasoned explanation why the examination and recordkeeping requirements of the 2018 Amendment satisfy the no-less-protection standard. The 2018 Amendment is therefore ultra vires and unenforceable. See 5 U.S.C. § 706(2)(A). The ordinary practice is to vacate unlawful agency action. See id. § 706(2) ("The reviewing court shall ... set aside agency action ... found to be" unlawful). In rare cases, however, we do not vacate the action but instead remand for the agency to correct its errors. MSHA asks us to do so here. The appropriateness of the remand-without-vacatur remedy turns on two factors: "(1) the seriousness of the deficiencies of the action, that is, how likely it is the agency will be able to justify its decision on remand; and (2) the disruptive consequences of vacatur." Heartland Reg'l Med. Ctr. v. Sebelius , 566 F.3d 193, 197 (D.C. Cir. 2009) (internal quotation marks, brackets, and ellipses omitted) (quoting Fox Television Stations, Inc. v. FCC , 280 F.3d 1027, 1048-49 (D.C. Cir. 2002) ). MSHA explains neither how the 2018 Amendment can be saved nor how vacatur will cause disruption. We therefore take the normal course and vacate the 2018 Amendment.[4]
The complicated procedural history of this case raises a question about what standard governs after vacatur. See supra at 1282. We agree with the parties that vacatur of the 2018 Amendment automatically resurrects the 2017 Standard. The 2018 Amendment modifies the terms of the 2017 Standard and so vacatur of the 2018 Amendment simply undoes those modifications. Examinations of Working Places in Metal and Nonmetal Mines , 83 Fed. Reg. at 15,056 (2018 Amendment "makes changes to" Code of Federal Regulations provisions "as amended by the Agency's final rule on examinations of working places that was published on January 23, 2017"). To avoid any confusion, we order MSHA to reinstate the 2017 Standard upon issuance of the mandate attendant on this opinion.
For the foregoing reasons, we vacate the 2018 Amendment and order the 2017 Standard reinstated.
So ordered .

MSHA contends on brief to us that the new examination requirement creates additional safety benefits by reducing "the risk that, between the time of the examination and the time miners begin work, conditions will have changed and created new or different hazards." The contention does not appear in the administrative record and so we do not consider it. See PG&E Gas Transmission, Nw. Corp. v. FERC , 315 F.3d 383, 388 (D.C. Cir. 2003) ("[T]his Court cannot consider ... post hoc justifications" and "may only consider the grounds on which the [agency] actually relied in making its decision.").

It is no answer to say, as MSHA does, that the preamble to the 2018 Amendment expresses MSHA's intention that miners receive notification before being exposed to adverse conditions. Examinations of Working Places in Metal and Nonmetal Mines , 83 Fed. Reg. at 15,058 ("MSHA intends for adverse conditions to be identified and miner notification provided before miners are potentially exposed to the conditions."). Mine operators must comply with the notification requirements of the 2018 Amendment, not MSHA's statements "from the preamble, which itself lacks the force and effect of law." See Saint Francis Med. Ctr. v. Azar , 894 F.3d 290, 297 (D.C. Cir. 2018).

MSHA's brief makes two additional arguments in support of the recordkeeping requirement. It "reduces the risk of inundating miners with information" and is "narrow" enough to lack safety implications. But these arguments do not appear in the administrative record and thus we do not consider them. SEC v. Chenery Corp. , 318 U.S. 80, 87, 63 S.Ct. 454, 87 L.Ed. 626 (1943) ("The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based.").
Our dissenting colleague believes MSHA's preamble statement about "overwhelm[ing] the record with minor housekeeping issues" counts as expressing concern about "inundating miners with information." Dissent at 1291. We see no basis for concluding that MSHA meant something other than what it said, especially considering (1) the statement about "overwhelm[ing] the record" appears in a paragraph regarding mine operator burdens, Examinations of Working Places in Metal and Nonmetal Mines , 83 Fed. Reg. at 15,059, and (2) mine operators, not miners, maintain the examination records, 30 C.F.R. § 56.18002(d) ("The operator shall maintain the examination records for at least one year ...."). Insofar as commenters raised a concern regarding the safety implications of "cluttering the examination record," Dissent at 1291 (citing J.A. 769, 911), MSHA never adopted that concern as its own, despite going out of its way to expressly adopt others. See Examinations of Working Places in Metal and Nonmetal Mines , 83 Fed. Reg. at 15,059.

Because we vacate the 2018 Amendment based on MSHA's failure to explain adequately its compliance with the no-less-protection standard, we need not-and hence do not-consider the petitioners' remaining APA and Mine Act arguments.