# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued November 7, 2012          Decided March 5, 2013

No. 12-5037

KAISER FOUNDATION HOSPITALS, DOING BUSINESS AS KAISER
FOUNDATION HOSPITAL - ANAHEIM, DOING BUSINESS AS
KAISER FOUNDATION HOSPITAL - BELLFLOWER, DOING
BUSINESS AS KAISER FOUNDATION HOSPITAL - FONTANA,
DOING BUSINESS AS KAISER FOUNDATION HOSPITAL - HARBOR
CITY, DOING BUSINESS AS KAISER FOUNDATION
HOSPITAL - PANORAMA CITY, DOING BUSINESS AS KAISER
FOUNDATION HOSPITAL - RIVERSIDE, DOING BUSINESS AS
KAISER FOUNDATION HOSPITAL - SAN DIEGO, DOING BUSINESS
AS KAISER FOUNDATION HOSPITAL - SUNSET, DOING BUSINESS
AS KAISER FOUNDATION HOSPITAL - WEST LOS ANGELES,
DOING BUSINESS AS KAISER FOUNDATION
HOSPITAL - WOODLAND HILLS,
APPELLEE

v.

KATHLEEN SEBELIUS, SECRETARY OF THE UNITED STATES
DEPARTMENT OF HEALTH AND HUMAN SERVICES,
APPELLANT

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:11-cv-00092)

———

*Howard S. Scher*, Attorney, U.S. Department of Justice, argued the cause for appellant. With him on the briefs were *Stuart F. Delery*, Acting Assistant Attorney General, *Ronald C. Machen Jr.*, U.S. Attorney, and *Michael S. Raab*, Attorney. *R. Craig Lawrence*, Assistant U.S. Attorney, entered an appearance.

*Jordan B. Keville* argued the cause for appellee. With him on the brief was *Jonathan P. Neustadter.  Harry R. Silver* entered an appearance.

Before: ROGERS, BROWN and KAVANAUGH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* BROWN.

BROWN, *Circuit Judge*: The Kaiser plaintiffs ("Kaiser") are a consortium of ten teaching hospitals located in Southern California that receive Medicare payments to offset the costs associated with training "full-time equivalent" residents and intern physicians ("FTEs"). In 1997, Congress capped those payments in such a way that the number of FTEs the hospitals trained in 1996 would dictate the maximum reimbursement in all future years. Although Kaiser and the Health and Human Services Secretary ("Secretary") agree the 1996 data is not accurate, the Secretary believes this predicate fact cannot be corrected outside the three-year reopening window, 42 C.F.R. § 405.1885.[1] Concluding otherwise, the District Court granted Kaiser's motion for summary judgment and remanded to the agency. *Kaiser Found. Hosps. v. Sebelius*, 828 F. Supp. 2d

---

[1] Technically, the Secretary has adopted the views of the Administrator of the Centers for Medicare and Medicaid Services ("CMS").

193, 204 (D.D.C. 2011). Unpersuaded by the Secretary's narrow, arbitrarily applied interpretation, we affirm.

I

A

As the District Court explained:

> The Medicare program, established under Title XVIII of the Social Security Act and administered through CMS, provides federally funded health insurance to eligible aged or disabled persons. *See generally* 42 U.S.C. § 1395 *et seq.* Under the program, the Department of Health and Human Services "reimburses medical providers for services they supply to eligible patients." *Northeast Hosp. Corp. v. Sebelius,* 657 F.3d 1, 2 (D.C. Cir. 2011); *see generally* 42 U.S.C. § 1395 *et seq.* In order to be reimbursed, hospitals must submit an annual cost report detailing the expenses they incurred during the past fiscal year. *See* 42 C.F.R. §§ 413.20, 413.24. The Secretary has contracted with fiscal intermediaries to audit cost reports, determine how much Medicare owes each provider, and issue interim payments. *See* 42 U.S.C. § 1395h; 42 C.F.R. § 405.1803.
>
> Among other things, Medicare reimburses approved teaching hospitals for the direct costs of graduate medical education (GME) — *e.g.*, salaries and benefits for residents and interns. *See* 42 C.F.R. § 413.75. The amount of GME reimbursement is based in part on the number of FTEs in the hospital's training program. *See* 42 U.S.C. § 1395ww(d)(5)(B)(ii); 42 C.F.R. § 413.79(d). In

1997, Congress imposed a cap on the number of FTEs a hospital may include for purposes of calculating future GME payment, which is known as the "GME FTE cap." *See* 42 U.S.C. [§] 1395ww(h)(4)(F); 42 C.F.R. § 413.79(c)(2)(i). Specifically, for cost-report periods beginning on or after October 1, 1997, the hospital's unweighted FTE count — meaning the actual number of FTEs before applying statutorily specified weighting factors — "may not exceed the number . . . of such full-time equivalent residents for the hospital's most recent cost reporting period ending on or before December 31, 1996." 42 U.S.C. [§] 1395ww(h)(4)(F). In other words, the FTE count a hospital included in its latest pre-1997 report would determine its cap (and thereby affect its reimbursement) for the indefinite future.

Hospitals' pre-1997 reports included only a weighted FTE count. *See* 62 Fed. Reg. 46,004(V)(I)(2)(a). Because the FTE cap is calculated based on the unweighted count, and additional data needed to be collected to calculate that figure, the caps were not established until the providers' first cost report for the period beginning on or after October 1, 1997 — which for [Kaiser] was filed in 1998. *Id.* at 46,004, 46,005; *see also* 42 C.F.R. § 413.79. "FTE count," therefore, refers to the weighted figure provided in the hospitals' pre-1997 cost reports, and "FTE cap" refers to the cap established thereafter based on the unweighted FTE count.

Once the GME FTE cap is established, the intermediary takes it into account when reviewing a hospital's cost reports. *See* 42 C.F.R. § 413.79. After

such review, the intermediary issues a "notice of program reimbursement" (NPR) indicating how much Medicare owes the hospital for the fiscal year covered by the report. *See* 42 C.F.R. § 405.1803. The hospital has 180 days from receipt of the NPR to request a review by the Provider Reimbursement Review Board (PRRB). *See* 42 U.S.C. § 1395*oo*(a). If the hospital does not timely appeal the NPR, the cost report is considered final. *See* 42 C.F.R. § 405.1807(c).

The reimbursement determination may nevertheless be reopened — upon a provider's request or at the intermediary's own initiative — within three years of the date of the NPR. . . . Once three years has passed, the intermediary's determination is deemed "closed" and can no longer be reopened.

*Kaiser*, 828 F. Supp. 2d at 195–96.

## B

Before this litigation began, a separate group of Northern California-based Kaiser hospitals complained clinic-based residents were mistakenly excluded from their "Indirect Medical Education" ("IME") resident FTE count. The PRRB agreed these residents should be included, *see Kaiser Found. Grp. v. Aetna Life Ins. Co.*, PRRB Dec. No. 96-D50 (Aug. 14, 1996), and the CMS affirmed, *see Kaiser Found. Grp. v. Aetna Life Ins. Co.*, HCFA Administrator Decision (Oct. 21, 1996) *reprinted in* [1996–2 Transfer Binder] Medicare & Medicaid Guide (CCH) ¶ 44,980. Following suit, the present Kaiser plaintiffs requested a similar adjustment in their own IME resident FTE count but "did not request a similar

adjustment for *GME* purposes in their 1996 cost reports." Appellant Br. at 14.

This oversight would haunt Kaiser. For years, Kaiser's intermediary used the inaccurate resident FTE count from the 1996 cost report coupled with additional data from the 1998 cost report — the "predicate facts" — to generate artificially low GME FTE caps.[2] Kaiser only challenged the errant data in its appeal of the intermediary's handling of the 1999–2003 cost reporting years. By then, however, the 1996 and 1998 cost reporting years were "closed." They had fallen outside of the three-year reopening window.

Accepting as much, Kaiser forswears any direct challenge to the 1996 and 1998 cost reports. Although the intermediary would have to adjust the total reimbursement for the open cost reporting years 1999–2003 using the corrected GME FTE cap, nothing, Kaiser maintains, would necessitate an adjustment to the total reimbursement from either closed reporting period. In other words, Kasier does not believe its challenge would have improper retroactive effect because the intermediary would not have to reopen any closed cost report. *See* Appellee Br. at 11.

The intermediary was unconvinced. Any modification of the data underlying the 1996/1998 GME FTE cap, it reasoned, would constitute a reopening of closed years even if it did not affect Kaiser's final reimbursement determination. *See Kaiser*, 828 F. Supp. 2d at 197. The PRRB agreed with Kaiser's position. *See Kaiser Found. Hosps. v. Palmetto GBA/First Coast Serv. Options*, PRRB Dec. No. 2011-D1 (Oct. 1, 2010). But the CMS Administrator, after *sua sponte*

---

[2] A higher FTE cap would have allowed Kaiser to claim — and presumably obtain — greater reimbursements.

review, did not. *See Kaiser Found. Hosps. v. Palmetto GBA/First Coast Serv. Options*, HCFA Administrator Decision (Nov. 30, 2010). Because the Administrator's reversal constituted the final decision of the Secretary, *see* 42 U.S.C. § 1395*oo*(f), Kaiser renewed its challenge in the District Court.

Finding in Kaiser's favor, the District Court granted Kaiser's motion for summary judgment and remanded the matter to the agency. *See Kaiser*, 828 F. Supp. 2d at 204. Assuming *arguendo* that the FTE cap was tied to a specific cost report, the court concluded modifying FTE counts in closed years did not constitute a "reopening." The Secretary's interpretation ran afoul of the plain language of the reopening regulation, *id.* at 199–200, and, among other shortcomings, contravened recent cases in which the Secretary took contrary positions, *id.* at 200–02. The Secretary appealed.

On appeal, the agency advances two sets of arguments. First, changes to predicate facts in closed years constitute an impermissible reopening under § 405.1885. Second, and in the alternative, even if the modification of predicate facts in a closed year does not itself amount to a reopening, the change will necessitate an adjustment of that year's reimbursement, which all parties agree constitutes an impermissible reopening. We consider each argument in turn.[3]

II

A

---

[3] Like the District Court, we assume *arguendo* that the cap is tied to particular cost reports. *Kaiser*, 828 F. Supp. 2d at 199.

In relevant part, the Secretary's reopening regulation provides:

> A determination of an intermediary . . . may be reopened with respect to findings on matters at issue in such determination . . . . Any such request to reopen must be made within 3 years of the date of the notice of the intermediary . . . decision . . . .

42 C.F.R. § 405.1885(a) (2001).[4] For a provider like Kaiser that has filed cost reports pursuant to 42 C.F.R §§ 413.20 and 413.24(f), "Intermediary determination" is defined as:

> a determination of the amount of total reimbursement due the provider, pursuant to § 405.1803 following the close of the provider's cost reporting period, for items and services furnished to [Medicare] beneficiaries for which reimbursement may be made on a reasonable cost basis under Medicare for the period covered by the cost report.

42 C.F.R. § 405.1801(a). In simpler terms, § 405.1801(a) speaks of inputs and outputs — the "items and services furnished" and the "amount of total reimbursement due," respectively.

In Kaiser's view, the reference to "total amount of reimbursement" establishes that "a cost report [is] only . . . 'reopened' . . . where there is a change to the total amount of

___

[4] Although the reopening regulation was amended in 2008, the court below "cited to this version without explanation." Appellant Br. at 5 n.3. We agree with the Secretary, however, that the "oversight is irrelevant." *Id.* The operative language remained the same. *Compare* 42 C.F.R. § 405.1885(a) (2001), *with* 42 C.F.R. § 405.1885(a)(1), (b)(2) (2010).

Medicare compensation paid to a provider." Appellee Br. at 21. In contrast, "reconsideration of predicate factual issues" with no effect on closed reimbursements does not reopen the report. *Id.* Meaning, the intermediary will only have reopened a "determination" subject to the three-year reopening window if it adjusts the output, not the inputs.

The Secretary, by contrast, believes inputs matter independently of the output. In her view, toggling an input would constitute a reopening of an "Intermediary determination" irrespective of its effect on the output. Consequently, any alteration of predicate facts must be done within the three-year reopening window. The Secretary argues the output language cannot be read without reference to the input language since it is "difficult to imagine that the 'amount owed' can in any sense be separated from the data upon which it is based." Appellant Br. at 25, 28. In like vein, the Secretary also maintains that § 405.1801(a)'s cross-reference to 42 C.F.R. § 405.1803 is suggestive because the latter's requirement of notice "[e]xplain[ing] the intermediary's determination of total program reimbursement due," *id.* § 405.1803(a)(1)(i), "will necessarily refer to the data (or predicate facts) upon which the total reimbursement is based." Appellant Br. at 25.

The Secretary thinks her interpretation is entitled to deference under *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410 (1945), and its progeny. We disagree. Although courts will normally give "controlling weight" to an agency's interpretation of its own regulations, *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994) (internal quotation marks omitted), deference is unmerited where the interpretation is "plainly erroneous or inconsistent with the regulation . . . ." *Ass'n of Private Sector Colls. & Univs. v. Duncan*, 681 F.3d 427, 442 (D.C. Cir. 2012) (internal

quotation marks and citations omitted). Believing the Secretary's interpretation to be inconsistent with her own regulations, we decline the invitation to defer.

To start, we think the plain language of § 405.1801(a)(1), which defines "determination of an intermediary," a phrase that appears in the reopening regulation, too suggestive to ignore. Where the term "determination" is both spatially proximate to — and logically bound with — "total reimbursement," an output, the mere mention of inputs in a separate, subsequent clause does not automatically render those inputs material to the definition.[5] Indeed, contextual clues lead us to believe that the reference to inputs is more likely illustrative than essential. Consider, for example, the structure of § 405.1801(a), which consists of four context-dependent definitions of "Intermediary determination." When speaking of "a hospital that receives payments for inpatient hospital services under the prospective payment system," the phrase is defined as:

> a determination of the total amount of payment due the hospital, pursuant to § 405.1803 following the close of the hospital's cost reporting period, under that system for the period covered by the determination.

42 C.F.R. § 405.1801(a)(2). But for the descriptive final clause, the operative language in this provision and § 405.1801(a)(1) would be functionally indistinguishable.

---

[5] Both parties agree that the "total reimbursement" is "material" because any effort to adjust this figure would necessarily constitute a reopening of an intermediary determination. Their dispute turns instead on whether the intermediary's toggling of the inputs would, on its own, do the same. This is what we mean when we speak of materiality — an intermediary action capable of triggering § 405.1801(a)(1) and, in turn, the reopening provision.

*Compare id.* § 405.1801(a)(1) ("a determination of the amount of total reimbursement due the provider), *with id.* § 405.1801(a)(2) ("a determination of the total amount of payment due the hospital"). This is by no means dispositive indicium of the agency's intent, but we do think it suggestive. A functional explanation for the inclusion of the "items and services" language — to differentiate among contexts — cuts against the Secretary's *a priori* argument that the mere presence of the input clause is itself proof of its materiality.[6]

Even assuming § 405.1801 could bear the Secretary's strained interpretation, the reopening regulation cannot. Under § 405.1885(a), an intermediary determination can "be reopened with respect to findings on matters at issue in such determination" if challenged within the three-year window. As the Eighth Circuit explained in *HealthEast*, "[i]t would make no sense to say that an intermediary determination . . . could be reopened 'with respect to' predicate factual questions that do not alter the total reimbursement amount." *HealthEast Bethesda Lutheran Hosp. & Rehab. Ctr. v. Shalala*, 164 F.3d 415, 418 (8th Cir. 1998). It is only when alteration of the "matters at issue" could change the total reimbursement determination that it "make[s] sense to say that a determination could be reopened 'with respect to' them." *Id.* This interpretation, the court concluded, "is the

---

[6] The Secretary's argument regarding the intervening citation to § 405.1803 suffers from the same conceptual shortcomings. That provision is entirely procedural. It identifies the steps the intermediary must take to issue a determination but offers no insight as to what constitutes a reopening. Again, the Secretary has proffered nothing to convince us that the mere reference to inputs somehow imbues them with independent, material significance.

only interpretation logically consistent with the regulatory language." *Id.*[7] We concur.

Nor do we believe *Regions Hospital v. Shalala*, 522 U.S. 448 (1998), compels a contrary result. The issue before the Court in that case was a narrow one: did Congress intend "to prohibit the Secretary from ensuring an accurate GME base-year amount by reauditing a provider's statement of 1984 GME costs for past errors, outside the Secretary's three-year reopening window." *Id.* at 457. Having found ambiguity in the relevant statutory language at *Chevron* Step One, the Court proceeded to determine the reasonableness *vel non* of the Secretary's reaudit regulation. *See id.* at 457–60.

"The key point of *Regions*," the Secretary contends, "is the validity of the reaudit regulation; *without that regulatory authority* the reaudit of the [closed] cost reports would have been barred by the reopening regulation." Reply Br. at 26. The inferential argument might be restated thusly: the agency's decision to promulgate a reauditing provision is proof that reopening regulation does not, by its own terms, allow modification of predicate facts in closed years. We

---

[7] The Secretary in *HealthEast* agreed. With language mirroring Kaiser's own, the Secretary concluded that § 405.1801(a) — the very provision at issue here — "did not apply" to closed year loans "because the regulation limits reopening only with respect to 'intermediary determinations,' which are defined as the final determinations of the amount a hospital will be reimbursed." *HealthEast*, 164 F.3d at 417. "Since the amounts of the reimbursements for the [closed year] interest payments were not disturbed, the Secretary argued, the 'intermediary determination' was not improperly reopened." *Id.* The PRRB likewise agreed in *Edgemont Hospital v. Mutual of Omaha Insurance Co.*, PRRB Dec. No. 95-D34 (Apr. 6, 1995), a decision the Secretary did not reverse *sua sponte*.

disagree. At most, *Regions* and its analogue in this Court, *Administrators of Tulane Educational Fund v. Shalala*, 987 F.2d 790 (D.C. Cir. 1993), stand only for the proposition that the Secretary acted reasonably in promulgating a reauditing regulation in light of statutory silence. We fail to see how the Secretary's decision to announce its policy through rulemaking — a potentially pragmatic decision on the Secretary's part[8] — would necessarily foreclose the agency from interpreting the reopening regulation to the same effect.

The Secretary is not unfamiliar with this argument, having made it as recently as 2009. Citing *Regions*, the Secretary indicated that "even if the intermediary had reaudited and revised the IME FTE determination made in the 1996 base year cost report — and it did not — the Supreme Court has already held that such reauditing and revision is reasonable." *Hillcrest Riverside, Inc. v. Sebelius*, No. 09-cv-00018, Memorandum of Points and Authorities in Support of Defendant's Cross-Motion for Summary Judgment and Opposition to Plaintiff's Motion for Summary Judgment at 19 n.9 (D.D.C. Oct. 2, 2009). Seeing no reason to depart from the Secretary's recent wisdom, we hold that the reopening regulation allows for modification of predicate facts in closed years provided the change will only impact the total reimbursement determination in open years.

Alternatively, we agree with the District Court that the Secretary has acted arbitrarily in treating similarly situated

---

[8] A case-by-case approach would have been unwieldy and inefficient where the Secretary had "reason to believe some 'questionable' GME costs had been 'erroneously reimbursed' to providers for their 1984 fiscal year," *Regions*, 522 U.S. at 454, and was obligated to communicate that shortcoming — as well as all new changes in the methodology for Medicare payments — to private fiscal intermediaries.

14

parties differently. *Kaiser*, 828 F. Supp. 2d at 203; *see also Eagle Broad. Grp., Ltd. v. FCC*, 563 F.3d 543, 551 (D.C. Cir. 2009) ("[A]n agency may not treat like cases differently." (internal quotation marks omitted)); *Kreis v. Sec'y of the Air Force,* 406 F.3d 684, 687 (D.C. Cir. 2005) ("[A]n agency must treat similar cases in a similar manner unless it can provide a legitimate reason for failing to do so." (internal quotation marks omitted)). HHS routinely championed a permissive interpretation of the reopening regulation when correction of the predicate facts would have resulted in a windfall for the agency, *see, e.g.*, *HealthEast*, 164 F.3d at 416, but adopted a contrary view here, where the benefits would inure to the provider. At bottom, the Secretary has given us no reason to think that this inherently suspicious record was the product of reasoned, good faith decisionmaking. She has distinguished the cases on their facts, but these are distinctions without difference. Whether the reimbursement scheme in *HealthEast* is distinct from the one-off "data capture" here, Appellant Br. at 30, for example, is an entirely moot point; that fact played an inessential role in how the Secretary interpreted the reopening regulation.

B

The Secretary next argues that "the Medicare Act would not allow the intermediary to change the 1996 GME resident count . . . without . . . changing the corresponding reimbursement amount," Appellant Br. at 26, which all parties concede would constitute a reopening of an "Intermediary determination."

The District Court rejected this claim out of hand, noting that the Secretary offered "no legal support for her claim that the caps cannot be increased without modifying the total reimbursement for closed years, particularly where Plaintiffs

have disclaimed such sums." *Kaiser*, 828 F. Supp. 2d at 201. On appeal, the Secretary attempts to fill the legal void with three generic provisions of the Medicare statute that allegedly "*entitle*[] the provider to the reimbursement due under the GME . . . formulas." Appellant Br. at 26.[9]

We are unmoved. As a threshold matter, the Secretary has failed spectacularly to square this bold claim with — or otherwise justify the departure from — *HealthEast*, *Regions*, and (among others) *Tulane*. *See, e.g.*, *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 42 (1983); *E. Ky. Power Co-op, Inc. v. FERC*, 489 F.3d 1299, 1306 (D.C. Cir. 2007) (explaining that an agency "must provide reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored" (internal quotation marks omitted)). Those cases assumed alterations to predicate facts would *not* trigger a mandatory reauditing of closed year reimbursements, *see, e.g.*, *Regions*, 522 U.S. at 462, and the Secretary agreed.

III

For the foregoing reasons, the decision of the lower court is

*Affirmed*.

---

[9] They include 42 U.S.C. §§ 1395ww(h)(1) ("[T]he Secretary shall provide for payments for [GME] costs in accordance with [42 U.S.C. § 1395ww(h)(3)]"), 1395ww(d)(5)(B) ("The Secretary shall provide for an additional payment amount for . . . indirect costs of medical education."), and 1395g(a) ("The Secretary shall periodically determine the amount which should be paid under this part to each provider of services . . . with necessary adjustments on account of previously made overpayments or underpayments.").